DAVID KIM, a Minor, by Hye Jung Kim, his Mother and Next Friend, *et al.*, Plaintiffs-Appellants, v. EVANSTON HOSPITAL *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—90—3645

Opinion filed December 29, 1992.

---

*Justice Lorenz concurred in this opinion prior to his retirement.

882

Goldberg & Goldberg and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellants.

David J. Loughnane, of Pretzel & Stouffer, Chartered, of Chicago (Robert Marc Chemers and Robert J. Franco, of counsel), for appellees.

JUSTICE DiVITO delivered the opinion of the court:

In this medical malpractice action, plaintiff David Kim sought damages for injuries sustained when defendants allegedly failed to timely diagnose and treat him for meningitis on December 5, 1981. After a seven-week trial, a jury found in favor of defendants and against plaintiffs. On appeal, plaintiffs contend that reversal is necessary because (1) defense counsel improperly characterized plaintiffs'

treating physicians as retained experts; (2) a hypothetical contained in a question by defense counsel improperly impugned a relative of plaintiffs' counsel; (3) defense counsel's closing argument improperly injected racial prejudice into the trial; and (4) the jury's verdict was against the manifest weight of the evidence.

On December 5, 1981, 16-day-old David Kim awoke at approximately 4 a.m. His mother, Hye Jung Kim, tried to feed him and noticed that he was fussy and slightly warm. By about 8 a.m., David had a fever of 103 degrees and refused to eat. Sometime between 8:10 and 8:20 a.m., Mrs. Kim called the Child and Adolescent Center, an outpatient clinic at Evanston Hospital. Plaintiffs asserted that she spoke to defendant Dr. John Reichert, plaintiffs' pediatrician, and that he told her that there was nothing to worry about but that she could bring David in during the normal clinic hours. Defendants asserted, however, that she spoke either to Dr. Herbert Philipsborn, the attending physician, or to no one.

Sometime between 9:30 and 10 a.m., David and his mother arrived at the clinic and were first seen by Philipsborn, who suspected "sepsis," a condition involving bacteria in the bloodstream. Philipsborn advised defendant Dr. Alan Resnick, the resident on the pediatric floor, that the child was fussy and had a fever, and instructed him to perform an evaluation in order to rule out sepsis. Philipsborn stated that he also called Reichert to tell him that his patient had been admitted to the hospital.

Resnick first determined that David required no immediate treatment and then spent 20 to 30 minutes taking a medical history and conducting a physical examination. Because sepsis was suspected, a spinal tap was performed and blood samples were drawn. An intravenous line (IV) was inserted between 11:15 and 11:30 a.m., approximately two hours after David arrived at the hospital. Although the objective was to administer antibiotics by IV as soon as possible, it could not be done, due to the fear of toxic effects, until the lab results were returned. At approximately 11:35 a.m., the IV became "infiltrated," that is, fluid leaked from the blood vessel and caused swelling around the IV. It was not until 12 p.m. that Resnick was able to successfully replace the IV. He explained that David's veins were so fragile that infiltration kept reoccurring. The medical record, however, bears no notation concerning any such fragility.

Even though an IV was in place around noon, Resnick was not able to administer the antibiotics for approximately one-half hour. Ruth Kinney, the manager of the biochemistry department at Evanston Hospital, testified that the tests took approximately one hour to

complete once the spinal fluid and blood samples were received. Moreover, no standardized solutions of antibiotics suitable for infants were kept on hand by the hospital pharmacy. Instead, the physician had to call the pharmacy to have the appropriate solution prepared. By 12:30 p.m., however, ampicillin was being administered to David.

Approximately 15 minutes after beginning the drug administration, the IV again became infiltrated. Resnick worked for approximately 15 minutes to reinsert the IV, and at 1 p.m., he requested Dr. Christie Martin's assistance. At approximately 1:15 p.m., Resnick was able to establish a good line. Although the medical record does not specify exactly what time the drug administration began, it does indicate that it began no later than 1:30 p.m.

By 2 p.m., the patient was stable and the "gram stain" test result, critical in the diagnosis of meningitis, came back from the laboratory. The test result indicated a "gram positive organism," or "group B strep," in the spinal fluid which can cause meningitis. Because of the test result, David's medication was changed to penicillin G.

At approximately 4 p.m., David suddenly began having seizure activity, with a jerking of the eyes and shakiness. Resnick gave him valium and phenobarbital to control the seizures, and then called Reichert, who said that he was coming to the hospital. About 20 minutes later, Resnick called the intensive care unit (ICU) to advise that he wanted the child admitted to the infant special care unit, and to request the assistance of Dr. Martin. After Reichert arrived at the hospital between 4:30 and 4:45 p.m., he and Resnick called the ICU to have David admitted there, but were told that no bed space was available in either the adult or infant units. They then decided to transfer the infant to the ICU at Children's Memorial Hospital. Except for his signature at the end of the "work up" done by Resnick, Reichert made no markings in the medical record.

During this time, David's breathing patterns became erratic. Resnick administered oxygen with a face mask and called an anesthesiologist to "intubate" him. An anesthesiology resident came and placed an endotracheal tube in David's windpipe. The anesthesiologist made no entries in the medical record.

Children's Memorial Hospital was called at 5 p.m. A transfer team arrived at Evanston Hospital approximately one hour later, and began preparing the paperwork. At 6:55 p.m., David was transferred to Children's Memorial Hospital.

In their lawsuit, plaintiffs asserted that defendants deviated from the standard of care when they failed to administer the antibiotics in

a timely manner, when they failed to place David in a pediatric unit as soon as possible, and when Reichert failed to instruct plaintiffs to go to the emergency room when he spoke to Mrs. Kim on the morning of December 5, 1981.

During the seven-week trial, much evidence was presented by the parties. On behalf of plaintiffs, Dr. Frank Baker testified that Reichert deviated from the standard of care when he failed to instruct Mrs. Kim to take her child to the emergency room when she called him that morning and told him that the infant had a fever. Baker explained that whenever a baby less than 28 days old has a fever, there is a presumptive diagnosis of sepsis. He stated that antibiotics should have been administered within a half-hour of the spinal tap, but that nearly two hours had elapsed in this case. He also stated that effective treatment of meningitis requires that the antibiotics be administered in a timely manner and that the medical records should have indicated any difficulty in maintaining the IV.

Dr. James Todd also testified for plaintiffs. He agreed that Reichert violated the standard of care by telling Mrs. Kim to wait until the clinic's regular hours. He also stated that drug therapy should begin as soon as possible, within 10 to 15 minutes of the spinal tap. He stated, however, that David already had meningitis when he arrived at the hospital.

Dr. Robert Eilers, a specialist in rehabilitative medicine, was called to testify as a treating physician by plaintiffs. He stated that he conducted the type of examination of David Kim that he does on all of his other patients, and he expects David to have a normal life expectancy. Although he stated that he had been involved with approximately five cases where plaintiffs' counsel also was involved, Mrs. Kim testified that she learned of Eilers through a parents group, and took her son to him to learn what type of therapy would be helpful.

Dr. Lawrence Tomasi also testified as a treating physician for plaintiffs. He stated that he supervised the doctors at Children's Memorial Hospital who treated David. He believed David's nervous system would never recover. Under cross-examination, he stated that he had consulted or testified for plaintiffs' counsel approximately 12 to 14 times prior to the instant case.

Dr. Jerome Klein testified for defendants and explained that David suffered from fulminant meningitis rather than insidious meningitis. Fulminant meningitis has no symptoms and comes on quickly, in an "explosive fashion." In his opinion, an earlier administration of antibiotics would not have changed the outcome, because

the only means of preventing the disease is to treat it 4 to 12 hours before its onset. The onset of the disease in this case most likely occurred before David went to bed that night, and, therefore, the progression of the disease was "unstoppable."

During his testimony, Dale Sowders, the legal affairs coordinator for Evanston Hospital, explained the hospital's procedures for updating files and who had access to the medical records.

As previously indicated, the jury found for defendants and against plaintiffs. Plaintiffs filed a post-trial motion, which the circuit court denied. This appeal followed.

■ Initially, we address defendants' contention that because plaintiffs have failed to file a record which conforms with Illinois Supreme Court Rule 321 (134 Ill. 2d R. 321), this court should summarily affirm the circuit court. Defendants point out that plaintiffs filed only the common law record and failed to file a report of proceedings as part of the record on appeal. Under Rule 323(a), the report of proceedings included in the record on appeal "shall include all the evidence pertinent to the issues on appeal." (134 Ill. 2d R. 323(a).) Because a report of proceedings has not been filed and because such a report is essential to determine the validity of the issues raised by plaintiffs on appeal, defendants argue, summary affirmance should occur.

In their initial brief, plaintiffs state in a footnote that the report of proceedings was "inadvertently omitted from the Record on Appeal and will be filed in a Supplemental Record." In their reply brief, plaintiffs state that they encountered difficulties obtaining a complete set of transcripts because one of the court reporters moved out of State and was unable to finish the transcription in a timely manner. Plaintiffs included an affidavit from the president of the reporting service explaining efforts to obtain the transcripts.

The notice of appeal in this case was filed in December 1990. The record was filed in July 1991, and plaintiffs' initial brief was filed the following December. Oral arguments were scheduled and held in this case in October 1992. Even though plaintiffs indicated an intent to file the report of proceedings as a supplemental record in their opening brief, no attempt was made until after the clerk of this court contacted plaintiffs' counsel in order to verify that no supplemental record was ever filed. Three days later, and only five days before oral arguments, plaintiffs filed a motion in this court to supplement the record with the transcript. Because of the timing of the motion and because the submitted report of proceedings was neither certified nor

bound (see Rules 323(b) and 324 (134 Ill. 2d Rules 323(b), 324)), we denied the motion.

At oral arguments, plaintiffs' counsel explained that he was not able to supplement the record any earlier because defense counsel refused to stipulate to his doing so, and the clerk of the circuit court refused to bind the transcript without such a stipulation. We consider this argument to be a complete misapprehension of the relevant rules relating to the filing of the record for appellate review. Rule 323 provides the requirements for the filing of the report of proceedings and authorizes this court, or any judge thereof, to extend the time for its filing upon the showing of necessity. (134 Ill. 2d R. 323(e).) Moreover, Rule 329 authorizes this court, or a judge thereof, to order that a supplemental record be filed to correct any material omission or inaccuracy in the record on appeal. (134 Ill. 2d R. 329.) Thus, rather than being precluded from acting by these rules, plaintiffs simply failed to abide by them in the ample time they had to do so.

█ It is the duty of the appellants to present a complete record to the reviewing court, so that the court may be fully informed about the issues that it must resolve. (*Robles v. Chicago Transit Authority* (1988), 173 Ill. App. 3d 46, 54-55, 527 N.E.2d 361, 367, *appeal denied* (1988), 123 Ill. 2d 566, 535 N.E.2d 410.) In the absence of such a record, it is presumed that the circuit court conformed to the law, and that the evidence supported its rulings. *Wyman-Gordon Co. v. Bernardi* (1983), 135 Ill. App. 3d 685, 689, 481 N.E.2d 1285, 1288.

In the instant case, since all of plaintiffs' alleged errors require an examination of the record of the proceedings below, we could hold that the failure to file the report of proceedings constituted a waiver of those errors. We decline to do so here, however, because of the special considerations that must be given when a minor is involved in a lawsuit. (See *Severs v. Country Mutual Insurance Co.* (1982), 89 Ill. 2d 515, 520-21, 434 N.E.2d 290, 292 (holding that the limitation provision of the uninsured motorist section of the Insurance Code is against public policy when applied to a minor); *Muscarello v. Peterson* (1960), 20 Ill. 2d 548, 555-56, 170 N.E.2d 564, 569 (holding that when a minor is involved, a reviewing court may consider matters not properly preserved for appeal).) "Minor litigants are *** entitled to special protection by the courts, particularly to see that their rights are protected even from the neglect of their representative in order to do substantial justice." (*Brandon v. DeBusk* (1980), 85 Ill. App. 3d 645, 648, 407 N.E.2d 193, 195 (because a minor was involved, the circuit court's dismissal of the case as a discovery sanction was reversed).) We believe that "substantial justice" requires us to examine the sub-

mitted transcripts and to reach the merits of this case; accordingly, we vacate our prior order and allow the filing of the submitted report of proceedings. Our ruling, however, should not be construed as precedent for the proposition that the merits of an appeal will be considered despite the incompleteness of the record. We stress that, but for the special considerations involved here, which might carry no weight in a future case, this case would be summarily affirmed.

Plaintiffs' first contention on appeal is that they were denied a fair trial when defendants were allowed to cross-examine the treating physicians as expert witnesses and to characterize them during closing argument as retained experts, thereby requesting the jury to ignore an earlier ruling by the circuit court that they were treating physicians. Specifically, plaintiffs assert as error defendants' inquiries regarding the number of times Drs. Eilers and Tomasi each had testified in cases involving plaintiffs' counsel, and defendants' argument that the jurors carefully consider the testimony of those doctors because they had little personal knowledge of David's situation and had repeatedly testified in cases for plaintiffs' counsel. Plaintiffs argue that the circuit court had previously ruled as a matter of law that Eilers and Tomasi were treating physicians rather than expert witnesses, when, in a pretrial order, it included them in a list of those treating physicians whom plaintiffs could call at trial. Defendants respond that the doctors were actually retained as expert witnesses rather than treating physicians, and they were therefore justified in treating them as such. In support of their contention, defendants rely on another section of the same pretrial order, where the circuit court also ruled that both Eilers and Tomasi were experts when it included them in a list of expert witnesses that plaintiffs could call at trial. Defendants also point out that both doctors were disclosed by plaintiffs as experts who might be called at trial and that plaintiffs responded to Rule 220 interrogatories regarding Eilers' testimony.

Finally, defendants argue that any characterization of Tomasi and Eilers as treating physicians is disingenuous. They argue that Eilers was merely a retained expert because he met with David only once, more than six years after the events in question occurred. Defendants also assert that Tomasi merely supervised the doctors at Children's Memorial and therefore had little involvement, if any, with plaintiffs. Defendants note that Tomasi stated in his discovery deposition that he had no recollection of the patient and that his handwriting is not on the medical chart.

■ Plaintiffs' contention that defendants improperly questioned and characterized the doctors as expert witnesses lacks merit. It is

well settled that unlike retained experts, the disclosure requirements of Rule 220 (134 Ill. 2d R. 220) do not apply to treating physicians. (See *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525.) This distinction is based on the belief that an opposing party will not be surprised when a treating physician testifies, because the witness was initially associated with the issues in litigation for reasons other than the sole purpose of rendering an opinion at trial. (*Tzystuck*, 124 Ill. 2d at 234-35, 529 N.E.2d at 528-29 (likening treating physicians to occurrence witnesses).) Because unfair surprise can be avoided by adequate preparation, Rule 220 disclosure is deemed unnecessary for treating physicians. *Wilson v. Chicago Transit Authority* (1988), 126 Ill. 2d 171, 176, 533 N.E.2d 894, 897; *Cochran v. The Great Atlantic & Pacific Tea Co.* (1990), 203 Ill. App. 3d 935, 941-42, 561 N.E.2d 229, 233.

■ This distinction, however, applies only to the method of disclosure, rather than the substance of the testimony. (*Fawcett v. Reinertsen* (1989), 131 Ill. 2d 380, 384-85, 546 N.E.2d 558, 560 (holding that a defendant-physician is analogous to a treating physician and that the relevant distinction between an expert witness and a defendant-physician is the manner of discovery rather than the scope of testimony).) The mere fact that a witness is a treating physician rather than a retained expert will not prevent the witness from expressing a medical opinion. (*Nastasi v. United Mine Workers of America Union Hospital* (1991), 209 Ill. App. 3d 830, 843, 567 N.E.2d 1358, 1367, *appeal denied* (1991), 141 Ill. 2d 544, 580 N.E.2d 118.) Treating physicians may render their professional opinions, including opinions regarding the applicable standard of care, even though they have not been disclosed as experts. (*Fawcett*, 131 Ill. 2d at 384-85, 546 N.E.2d at 560.) Therefore, it logically follows that an opposing party should have the same ability to cross-examine a treating physician that he would have in cross-examining a retained expert. A party may properly cross-examine a medical expert regarding fee arrangements, prior testimony for the same party, and financial interest in the outcome of the case. (*Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 408, 466 N.E.2d 210, 213.) Since counsel must be given the widest latitude to demonstrate any interest or bias of an expert through cross-examination (*Sanchez v. The Black Brothers Co.* (1981), 98 Ill. App. 3d 264, 423 N.E.2d 1309), we conclude that no error occurred here when defendants asked the witnesses whether they had ever before testified in a case for plaintiffs' counsel.

■ Similarly, we find no error in defendants' closing argument. During closing arguments, counsel may argue anything that is prop-

erly in evidence and draw reasonable inferences therefrom. (*Brown v. Moawad* (1991), 211 Ill. App. 3d 516, 528, 570 N.E.2d 490, 498, *appeal denied* (1991), 139 Ill. 2d 594, 575 N.E.2d 912.) In this case, the evidence demonstrated that both Eilers and Tomasi had limited involvement with plaintiffs and that they had a preexisting relationship with plaintiffs' counsel. Therefore, it was a permissible inference that the witnesses were more like retained experts than treating physicians. Because such an argument goes to the weight that the jury may afford the testimony (*Elliott v. Koch* (1990), 200 Ill. App. 3d 1, 20-21, 558 N.E.2d 493, 507, *appeal denied* (1990), 135 Ill. 2d 555, 564 N.E.2d 836), defendants' closing argument was proper.

■ Plaintiffs next allege that they were prejudiced when defendants improperly utilized a hypothetical involving a member of plaintiffs' counsel's family. They assert that prejudice occurred from the following exchange during the cross-examination of the hospital administrator:

"Q. And in terms of staff, would that also include any staff— if [plaintiffs' counsel's] father-in-law was a staff member at that time, would he also [have access to the hospital records?]

[PLAINTIFFS' COUNSEL]: Objection. There's no such testimony. I have no father-in-law that was there at the time. I would like to be heard."

The circuit court directed the jury to disregard the statement.

On appeal, plaintiffs claim that they were prejudiced by the hypothetical, because it was intended "to infer that plaintiff[s] had a mole on the hospital staff who stole the missing records." Defendants respond that plaintiffs invited the hypothetical by suggesting earlier that Reichert and Resnick had the motive and the opportunity to remove and destroy the medical records.

A circuit court's instruction to disregard certain evidence can cure prejudice resulting from the jury's exposure to that evidence. (*Downing v. United Auto Racing Association* (1991), 211 Ill. App. 3d 877, 893, 570 N.E.2d 828, 839, *appeal denied* (1991), 141 Ill. 2d 538, 580 N.E.2d 111.) Moreover, an error is not reversible unless it was substantially prejudicial, thereby affecting the outcome of the trial. (*Skelton v. Chicago Transit Authority* (1991), 214 Ill. App. 3d 554, 579, 573 N.E.2d 1315, 1332, *appeal denied* (1991), 141 Ill. 2d 561, 580 N.E.2d 135.) In the instant case, the court's instruction to disregard the statement cured any prejudice that may have resulted from it. Although we do not endorse the specific hypothetical used by defense counsel, we consider any error to be merely harmless as this one statement did not affect the outcome of the trial.

■ Plaintiffs also contend that defendants improperly asserted during opening statements that the fact that records were missing did not suggest that defendants had been negligent. Plaintiffs assert that the fact the records were missing led to the inference that defendants breached the standard of care. (See *Harrington v. Rush-Presbyterian-St. Luke's Hospital* (1990), 210 Ill. App. 3d 183, 187, 569 N.E.2d 15, 18 (holding that where the evidence was undisputed, a jury could properly infer negligent conduct from the fact that medical records were missing), *appeal denied* (1991), 141 Ill. 2d 540, 580 N.E.2d 114.) Defendants respond that even if the missing records raise such an inference, they would nevertheless be allowed to present evidence to the contrary. We agree. Illinois law allows a party to prove the substance of missing documents through secondary evidence (*Burns v. Schmidt* (1961), 22 Ill. 2d 47, 52, 174 N.E.2d 188, 191), and an attorney may discuss in his opening statement the evidence that he, in good faith, intends to introduce during the trial. (*Yedor v. Centre Properties, Inc.* (1988), 173 Ill. App. 3d 132, 143-44, 527 N.E.2d 414, 421.) Thus, because defendants could properly rebut the inference of negligence and endeavored to do so during trial, they committed no improprieties during their opening statement.

■ Plaintiffs next contend that defendants improperly injected racial prejudice into the trial by raising the inference during closing argument that if the jury found for plaintiffs, they would take the money and return to Korea. Plaintiffs claim that there was no evidence that the family intended to return to Korea and that Mr. Kim specifically denied any such intention. Defendants respond that the statement was made in response to a "grossly inflated lost earning projection" and that much evidence existed regarding the family's close ties with Korea. They point out that the family speaks Korean and that Mr. Kim teaches at a university in Korea, but returns to the United States as often as possible. Defendants also note that no objection was made at trial; the first time plaintiffs alleged any error was in their post-trial motion.

In order to properly preserve an issue for appeal, a party must both make a contemporaneous objection and raise the issue in a post-trial motion. (*Fakhoury v. Vapor Corp.* (1991), 218 Ill. App. 3d 20, 25, 578 N.E.2d 121, 125, *appeal denied* (1991), 142 Ill. 2d 653, 584 N.E.2d 128.) Since plaintiffs failed to object at trial, this issue was not properly preserved for appeal. Furthermore, even if the issue were properly preserved, any error was merely harmless because it did not change the result of the trial. There was much evidence that the Kim family maintained close ties with Korea, and it is a reason-

able inference that David might someday return to Korea to live. We conclude that no prejudicial error occurred because of these remarks.

■ Plaintiffs' last contention is that the jury's verdict was against the manifest weight of the evidence. A reviewing court will not set aside a jury verdict unless the verdict was contrary to the manifest weight of the evidence. (*Pharr v. Chicago Transit Authority* (1991), 220 Ill. App. 3d 509, 521, 581 N.E.2d 162, 169.) The question is not whether the evidence *could have* supported a verdict for the movant, but rather whether a contrary verdict is clearly evident. (*Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill. App. 3d 438, 444, 511 N.E.2d 798, 801, *appeal denied* (1987), 117 Ill. 2d 554, 517 N.E.2d 1096.) In this case, the jury heard all the evidence and found for defendants. Because we do not believe that a contrary verdict is clearly evident, we find that the jury's verdict was not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SCARIANO and McCORMICK, JJ., concur.