NO. 4-06-0284     Filed 1/23/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

KATHERINE ADAMS,                              )    Appeal from
          Plaintiff-Appellee,                 )    Circuit Court of
          v.                                  )    Coles County,
SARAH BUSH LINCOLN HEALTH CENTER,             )    No. 03L55
and KELLIE JONES-MONAHAN, M.D.,               )
          Defendants-Appellants.              )    Honorable
                                              )    Dale A. Cini,
                                              )    Judge Presiding
_____

          JUSTICE MYERSCOUGH delivered the opinion of the court

          Plaintiff, Katherine Adams, sued defendants, Dr. Kellie

Jones-Monahan and Sarah Bush Lincoln Health Center, alleging that

Dr. Jones-Monahan was negligent in removing Adams's gallbladder.

The jury returned a verdict in Adams's favor and assessed damages

against defendants in the amount of $561,389.90.  The trial court

denied defendants' motion for a new trial.  On appeal, defendants

argue that the trial court abused its discretion when it refused

to allow defendants to present certain portions of Dr. Steven

Strasberg's testimony during cross-examination or in their case

in chief and that the trial court abused its discretion by

allowing plaintiff to question defendants' expert Dr. Mark

Kadowaki regarding his knowledge of Dr. Strasberg's views of Dr.

Kadowaki's preferred surgical technique.  We affirm.

                         I. BACKGROUND

Plaintiff went to Sarah Bush Lincoln Health Center on November 15, 2002, for routine laparoscopic gallbladder-removal surgery, also known as cholecystectomy. The surgery was performed by Dr. Kellie Jones-Monahan. Prior to the surgery, Dr. Jones-Monahan warned plaintiff of possible complications that could result from the surgery, including injury to the common bile duct. Dr. Jones-Monahan also informed plaintiff of the possibility that she may have to convert the surgery from a laparoscopic procedure to open surgery if she encountered any problems. Plaintiff consented.

During the surgery, Dr. Jones-Monahan noted the gallbladder was intrahepatic, meaning it was almost completely encased by the liver. Dr. Jones-Monahan also noticed chronic scarring in the area of the bile ducts. During the surgery plaintiff's gallbladder was removed. However, Dr. Jones-Monahan also divided plaintiff's common bile duct, which is not supposed to be severed during this type of surgery. This created a serious injury to plaintiff's remaining biliary system. While still in the operating room after the surgery, Dr. Jones-Monahan conducted an X-ray, called a cholangiogram. The cholangiogram allowed Dr. Jones-Monahan to discover plaintiff had been injured. Also while still in the operating room, Dr. Jones-Monahan contacted Dr. Steven Strasberg, who was a surgeon specializing in hepatobiliary surgery at Barnes-Jewish Hospital in St. Louis,

Missouri (Barnes). The injury to plaintiff's common bile duct required her to be transported to Barnes via ambulance. At Barnes, Dr. Strasberg became plaintiff's treating physician. In February 2003, Dr. Strasberg performed surgery to repair the injury to plaintiff's common bile duct.

At trial, plaintiff presented Dr. Richard Vasquez as an expert witness. Dr. Vasquez testified that it was his opinion that Dr. Jones-Monahan did not comport with the standard of care in performing plaintiff's cholecystectomy. Dr. Vasquez explained the relevant anatomy and fundamentals of the surgery to the court. First, he explained that the liver creates bile and that the gallbladder acts as a reservoir for bile created by the liver. Its function is to break down the fats in food. Dr. Vasquez explained that the bile is carried through the liver by the right and left hepatic ducts. These two ducts join to form the common hepatic duct. The cystic duct from the gallbladder joins the common hepatic duct. Above this junction, the duct is referred to as the hepatic duct. Below this junction, it is called the common bile duct. The common bile duct empties bile into the opening of the small intestine, which is called the duodenum.

To remove the gallbladder, a doctor must identify and cut the cystic duct and the cystic artery. Nothing else need be cut to remove the gallbladder. Doctors may use what is called

the triangle of Calot to identify the structures properly. The triangle of Calot is an area bordered by the cystic artery, the cystic duct, and the common hepatic duct. If the doctor is uncertain whether she has identified the right structures, she may perform a cholangiogram, which is an X-ray conducted in the operating room that uses dye to show the doctor the location of the ducts. The doctor may also choose to open the patient's abdomen and perform open surgery.

Dr. Jones-Monahan did conduct a cholangiogram on plaintiff but not until after she had divided structures inside of her. Dr. Vasquez testified that Dr. Jones-Monahan should have used a cholangiogram prior to cutting any structures. Dr. Vasquez stated that Dr. Jones-Monahan was not operating within the triangle of Calot. He stated that failure to dissect within the triangle of Calot was a deviation from the standard of care. Dr. Vasquez said that Dr. Jones-Monahan's notes from the operation indicate that the cystic duct, which was the intended duct to dissect, was isolated. However, Dr. Vasquez points out that her notes never indicate that she had identified that duct or the cystic artery. Instead, Dr. Vasquez surmises that she was looking at the common bile duct, which she eventually cut. Dr. Vasquez said that the cholangiogram, if performed prior to cutting, would have shown Dr. Jones-Monahan that she was wrong. He also testified that Dr. Jones-Monahan's failure to convert the

- 4 -

surgery into an open procedure violated the standard of care.

Dr. Vasquez stated that variations in anatomy do not excuse injury. Any variations or abnormalities encountered by the doctor can be clarified by X-ray or by converting the procedure into an open surgery rather than laparoscopic. Dr. Vasquez agreed that telling a patient of the risks inherent in cholecystectomy surgery does not allow a doctor to injure the duct.

Dr. Jones-Monahan's testimony agreed with Dr. Vasquez's account of how the injury to plaintiff's common bile duct occurred. Dr. Jones-Monahan admitted a misidentification occurred and that the common bile duct had been mistakenly dissected. She said that at the conclusion of the procedure it appeared to her that plaintiff's hepatic duct had been divided. Dr. Jones-Monahan said that she would not refer to plaintiff's anatomy as abnormal. She said there was inflammation of the gallbladder, but that is to be expected of a patient who is having her gallbladder removed.

Dr. Jones-Monahan testified that she believed the hepatic duct may have been hiding or looped behind the cystic duct. She then said that it was possible that she put a clip on both and subsequently divided both structures. She testified that her theory about the ducts being looped around each other occurred to her after surgery and that she had no evidence that

this was, in fact, what happened. She agreed that she still was unsure of how plaintiff's injury occurred.

Dr. Jones-Monahan testified that she used the critical-view technique to identify the structures. This technique involves finding the cystic duct and cystic artery and isolating them before cutting. She agreed that the failure to achieve a critical view of these structures is an indication that the surgery should be converted to an open procedure. Based on the fact that the wrong structures were ultimately cut, Dr. Jones-Monahan stated that she had not obtained a critical view of the proper structures.

Dr. Jones-Monahan testified that at the time of the surgery she believed that her dissection of all the tissues to expose the ducts and arteries was complete and only realized that she had performed an incomplete dissection after the surgery. She agreed that an incomplete dissection was a deviation from the standard of care. Although she thought she divided the cystic duct, she admitted she instead cut the hepatic duct.

Dr. Strasberg was the treating physician who subsequently performed surgery on plaintiff to repair her injury. Plaintiff conducted an evidence deposition of Dr. Strasberg. To expedite the deposition, defendants and plaintiff agreed to reserve all objections except those based on form. Plaintiff's counsel questioned Dr. Strasberg. Defendants' counsel cross-

examined.  Plaintiff's counsel then conducted his redirect, stating that he was conducting his redirect subject to an objection he intended to make at trial regarding the scope of some of defense counsel's questions on cross-examination.

During the evidence deposition of Dr. Strasberg, which was taken prior to trial, plaintiff's attorney indicated he intended to object to portions of defense counsel's cross-examination of Dr. Strasberg.  At trial, plaintiff's attorney moved to strike portions of defendants' cross-examination of Dr. Strasberg for being beyond the scope of his direct examination. Plaintiff argued that he had not questioned Dr. Strasberg regarding standard of care and that defendants' cross-examination questioned Dr. Strasberg on the applicable standard of care. Defendants argue that plaintiff's counsel opened the door to cross-examination regarding the applicable standard of care during direct examination.  Defendants contend that during direct examination, plaintiff's counsel referenced articles that Dr. Strasberg had written and that these articles discuss the standard of care.

During direct examination, plaintiff's attorney asked Dr. Strasberg whether his articles were authoritative.  Dr. Strasberg said that they were.  Defendants argue that this opened the door for questions about a specific article on cross-examination.  Plaintiff never introduced any articles at trial.

- 7 -

Defendants' questions on cross-examination included questions such as:

"Q. First of all, is it true that in a lap-coli, a laparoscopic cholecystectomy[,] there are several accepted ways of identifying the cystic bile?

* * *

Q. And secondly, regardless of which method is used to identify the cystic duct, not one single method has proven to be infallible; would you agree with that?

* * *

Q. And would you also agree that because we can't eliminate the risk of a bile duct injury, it is standard of care to warn the patient preoperatively that this is a potential complication from the laparoscopic cholecystectomy?

* * *

Q. And some of these various methods of finding the cystic duct that you just identified have become more popular with some surgeons or others, but throughout their 15 years there still has been a recognized

- 8 -

complication rate?

* * *

Q. Okay. And has the--has the complication rate for bile duct injuries say leveled off now that we've been more than five and ten years past the beginning or the introduction of the procedure here in the United States?

* * *

Q. *** Nevertheless, it's still standard of care for you and for every surgeon to warn the patient in advance that this very thing could happen?"

The trial court granted plaintiff's motion to strike portions of defendants' cross-examination of Dr. Strasberg on the ground that the challenged questions on cross-examination impermissibly went into the issue of standard of care. Defendants then moved to have Dr. Strasberg's cross-examination entered as part of defendants' case in chief. Plaintiff objected because of the use of leading questions, and the court denied defendants' motion.

Plaintiff presented the trial court with a videotape of Dr. Strasberg's evidence deposition. Dr. Strasberg said that in the past 15 years, he had repaired about 120 injuries to the

bile-duct system created after another doctor attempted a laparoscopic cholecystectomy. Dr. Strasberg said that the primary purpose of plaintiff's first admission to Barnes was to "stabilize her for later reconstruction of the biliary injury, diagnosis, and stabilization." Dr. Strasberg said that after a biliary injury occurs, it sometimes progresses postoperatively because the blood vessels supplying the bile ducts may also be injured. He categorized the type of injury that plaintiff sustained as an E4 injury in which the left and right bile ducts were separated from each other. He said that there was no common bile duct left after surgery either because of scarring or because it had been completely removed during surgery. Dr. Strasberg testified that he had to reconnect the remaining bile duct with the intestine. The name of the procedure was an anterior hepaticojejunostomy. The procedure included a "Roux-en-Y," which was a way of preparing a piece of intestine to be reconnected to a new structure, and was not specifically related to this specific type of biliary surgery.

Dr. Strasberg said he first identified where the bile duct was injured and then joined the piece of intestine he had performed the Roux-en-Y on to the two ducts. The part of the bile duct that is connected to the intestine replaces the bile duct that had been removed or injured.

Dr. Strasberg said after the reconstruction surgery in

February 2003, he continued to follow plaintiff's progress.  He said that during the first six months after surgery it is important to make sure that the incisions heal well, that the patient is maintaining nutritional status, and that the patient is returning to normal activity.  Another reason he continued to monitor plaintiff was to observe whether the repair was working well and that her liver was functioning appropriately.  He said that plaintiff's liver function is a long-term interest that will likely be followed for about five years.

Dr. Strasberg said that his records indicated plaintiff was feeling well until February 2005.  After a magnetic resonance imaging (MRI), Dr. Strasberg said the radiologist who conducted the test was concerned about a stenosis, which meant a narrowing at the place where Dr. Strasberg had attached the right bile duct to the intestine.  Dr. Strasberg decided to monitor plaintiff because she appeared asymptomatic.  However, in March 2005, plaintiff's alkaline phosphatase level had risen to a point that concerned Dr. Strasberg.  He decided to check on her levels again in six months.  That six-month period was about to conclude at the time of Dr. Strasberg's deposition.  Dr. Strasberg testified that it is his practice to monitor patients for up to five years, although some doctors may choose to monitor patients the rest of their lives and others choose not to monitor a patient's liver function at all unless the patient appears symptomatic.

- 11 -

Dr. Strasberg said the standard of care does not require doctors to monitor patients the rest of their lives. However, Dr. Strasberg said that although rare, there have been occurrences of patients needing repairs of their bile duct reconstruction 30 years after the initial surgery. Patients remain at a risk of restenosis the rest of their lives. "Restenosis" is the term for a narrowing of the area that connects the bile duct to the intestine after reconstructive surgery. Dr. Strasberg, however, stated that the highest rates of stenoses, however, occur two to five years after surgery.

Defendants' expert, Dr. Mark Kadowaki, began his testimony by showing a videotape of himself performing portions of a cholecystectomy. Dr. Kadowaki explained that four techniques were used to perform a gallbladder removal and that Dr. Jones-Monahan had not used the critical-view technique. During cross-examination, plaintiff's attorney reminded him that Dr. Jones-Monahan testified earlier in the trial that she had used the critical-view technique during plaintiff's surgery. Dr. Kadowaki responded that more than one technique could be employed during a single surgery.

Dr. Kadowaki stated that it was his opinion that Dr. Jones-Monahan met the standard of care in performing plaintiff's surgery. Dr. Kadowaki stated that an adequate dissection is included in the applicable standard of care for a

cholecystectomy.  Dr. Kadowaki said that there was no conclusive identification of the structures in this case.  During plaintiff's cross-examination of Dr. Kadowaki, the following exchange occurred:

"Q.  Would you agree that Dr. Monahan did not do an adequate dissection in this case?

A.  No.

Q.  Because, she says she didn't do an adequate dissection as she reflects upon it now.  So, you disagree with her?

A.  Yes.

* * *

Q.  Does the standard of care require an adequate dissection?

A.  Yes, at the time of surgery.  In retrospect, you can look at things differently.

* * *

Q.  In fact, in this case, the critical view wasn't obtained because the wrong structures were clipped and divided, is that true?

A.  I don't think I would go from one to

the other.  The wrong structures were clipped.  There was a misidentification.  At the time, the dissection was deemed to be adequate.  In retrospect, it is deemed not to be.  This is true."

Dr. Kadowaki said that the standard of care requires the doctor to use a technique for gallbladder removal with which she is comfortable.  He testified that no technique is guaranteed to completely avoid injuries to the common bile duct.  He said that the complication rate for this surgery consists of injuries that occur absent negligence.

The jury returned a verdict in favor of plaintiff in the amount of $561,389.90.  The jury awarded plaintiff $95,570.90 for necessary medical care, treatment, and services; $3,819 in lost earnings; $250,000 for pain and suffering; and $212,000 for loss of normal future life experience.  Defendants filed a posttrial motion requesting a new trial.  Defendants again argued that their cross-examination of Dr. Strasberg was proper and should have been allowed either as cross-examination or in defendants' case in chief and that plaintiff's cross-examination of defendants' expert, Dr. Kadowaki, was improper.  The trial court denied defendants' posttrial motion.  This appeal followed.

## II. ANALYSIS

### A. The Trial Court's Refusal To Allow Defendant's Cross-Examination of Dr. Strasberg Was Not an Abuse of Discretion

Defendants first argue that the trial court erred when it barred portions of defendants' cross-examination of Dr. Strasberg.  Before reaching the merits of defendants' argument, this court notes that the record is incomplete.  The testimony was presented in court via videotape.  It was not reported.  A copy of that videotape is not contained within the record on appeal even though the trial court stated the following before issuing its ruling on the posttrial motion:

> "Let me first note counsel that the file contains a copy of the transcript of Dr. Strasburg's [sic] [e]vidence [d]eposition, but it is not the edited transcript.  If you'll recall a [sic] trial I had what I might call a work copy, and I was making notes on it in connection with objections that were made, and rulings, and portions of the doctor's testimony that were stricken.  I believe the file also has a disk of the testimony, but I am not entirely certain about that.  So if this case goes up on appeal you might recall for the Appellate Court that [p]laintiff's [e]xhibit [No.] 15 'A' is an unedited portion of the transcript of Dr. Strasburg's [sic] [e]vidence

- 15 -

[d]eposition."

The unedited transcript is in the record.  The record also contains defendants' DVD (digital video disc) of the portions of Dr. Strasberg's cross-examination that were stricken by the trial court, but this court does not have computers capable of reading DVDs.  No edited transcript or DVD of the testimony from Dr. Strasberg's evidence deposition that was actually played for the jury is contained in the record on appeal.  Furthermore, defendants' brief did not direct this court to plaintiff's exhibit No. 15 "A".

An incomplete record is a violation of the supreme court rules.  Supreme Court Rule 323(a) requires that the record on appeal "shall include all the evidence pertinent to the issues on appeal."  134 Ill. 2d R. 323(a).  It is the appellants' duty to supply a complete record to the reviewing court.  Kim v. Evanston Hospital, 240 Ill. App. 3d 881, 888, 608 N.E.2d 371, 375 (1992).  The record should allow the reviewing court to be fully informed of the pertinent issues.  Kim, 240 Ill. App. 3d at 888, 608 N.E.2d at 375.  Absent a sufficient record, the reviewing court presumes that the trial court conformed to the law and that its rulings were supported by the evidence.  Kim, 240 Ill. App. 3d at 888, 608 N.E.2d at 375.

Although noncompliance with Rule 323(a) is grounds for summary affirmance of the trial court, having pieced together Dr.

Strasberg's testimony from the line references in the transcript, we will address the merits. Since the record contains a reference to the lines of the transcript of Dr. Strasberg's deposition that were stricken, we can discern Dr. Strasberg's digitally recorded testimony from the record.

Defendants also present this court with an extensive analysis of a recent Third District Appellate Court Rule 23 order, Andris v. Clemson, No. 3-05-0396 (June 5, 2006) (unpublished order under supreme Court Rule 23), which they argue is factually analogous to the present case and should be followed by this court. Defendants also attach this order to their brief. Rule 23(e) states that an unpublished order is not precedential and may not be cited by any party except to support contentions of double jeopardy, res judicata, collateral estoppel, or law of the case. Defendant is not using Andris for any of these purposes. Andris is not controlling.

When a party challenges a trial court's evidentiary ruling, the standard of review is abuse of discretion. Leonardi v. Loyola University of Chicago, 168 Ill. 2d 83, 92, 658 N.E.2d 450, 454-55 (1995). Clearly, the scope and extent of cross-examination and recross-examination are within the discretion of the court. People v. Kirchner 194 Ill. 2d 502, 536, 743 N.E.2d 94, 112 (2000); Johns-Manville Products Corp. v. Industrial Comm'n, 78 Ill. 2d 171, 181, 399 N.E.2d 606, 611

- 17 -

(1979). "[C]ross-examination should be kept within fair and reasonable limits, and it is only in a case of clear abuse of such discretion, resulting in manifest prejudice to the defendant, that a reviewing court will interfere." People v. Halteman, 10 Ill. 2d 74, 86, 139 N.E.2d 286, 294 (1956).

Plaintiff offered Dr. Strasberg's evidence deposition as the testimony of a treating physician in this case, not plaintiff's expert. Dr. Vasquez testified as plaintiff's expert in the case. Dr. Strasberg's direct testimony during his videotaped evidentiary deposition was limited to the reconstructive surgery he performed on plaintiff. Dr. Strasberg stated that he had written several articles and chapters on laparoscopic bile duct injuries. Plaintiff asked, "As an example, there's an article you authored, 'Laparoscopic Bile Duct Injuries,' which is it the--which journal did that appear in?" Dr. Strasberg replied:

"Well, you would have to show me the particular article, because I've authored a number of them. This looks like it's a chapter as a--in a book, and I'm not sure what chapter it is to tell you the truth, because I've written a lot of chapters. I'm not sure when this particular one was done just from looking at it because it's--it's--

- 18 -

there's nothing on here that indicates which chapter this is. But it is something that I wrote. It doesn't say the date or the place where it was published. I've probably written 30 articles and chapters on this subject, so I can't identify a particular chapter without a little more information."

Plaintiff then asked, "And would you consider your articles to be authoritative on the subject of laparoscopic bile-duct injuries?" Dr. Strasberg replied, "yes." The only other time this article or chapter came up was when Dr. Strasberg requested that he be able to point out the injuries plaintiff sustained using a diagram in the chapter rather than the one the attorney had provided.

The trial court sustained plaintiff's objection to defendants' cross-examination of Dr. Strasberg regarding the issue of standard of care because it was beyond the scope of plaintiff's direct examination of the witness. Defendants' cross-examination begins by questioning Dr. Strasberg about different methods of performing a laparoscopic cholecystectomy, which is a subject he had not testified to during direct examination. Defendants' questioning began by asking Dr. Strasberg, "[I]s it true that in a lap-coli, a laparoscopic cholecystectomy[,] there are several accepted ways of identifying

the cystic bile?"  Defendants also asked Dr. Strasberg, "And would you also agree that because we can't eliminate the risk of a bile-duct injury, it is standard of care to warn the patient preoperatively that this is a potential complication from the laparoscopic cholecystectomy?"  Defendants' cross-examination continued to question Dr. Strasberg about these different methods as well as his personal experience performing laparoscopic cholecystectomies.

Defendants argued that plaintiff's reference to articles Dr. Strasberg had written opened the door to the issue of standard of care because these articles addressed that issue. However, the articles were never introduced into evidence.

In ruling on defendants' posttrial motion for a new trial, the trial court held:

"It's probably an oversimplification to say that there's a heart of any medical malpractice case, but with that in mind, I am certainly of the opinion that the heart of any medical malpractice case almost, without exception, is the testimony of expert witnesses with regard to standard of care and claimed breaches thereof.

In my review of Dr. Strasburg's [sic] deposition and in particular his direct

examination, I noted the following: Plaintiff's attorney asked no questions about standard of care in regard to laparoscopic cholecystectomies. He asks no questions about acceptable ways of identifying the cystic duct during surgery. He asks no questions about risks attendant to laparoscopic cholecystectomy procedures. He asked no questions about the appropriate pre-operative warnings to be given a patient. He asked no questions about the critical-view method of identifying the cystic duct during surgery. He asked no questions about the infundibular approach. He asked no questions about the use of intra-operative colanalgiagrams [sic]. He asks no questions about tracing the cystic duct to form the common bile duct and identifying all three by dissection. And he asks no questions about complication rates.

From my review of the direct examination[,] it is abundantly and overwhelmingly clear that the plaintiff's attorney steered clear, and well clear, of

making any inquiries about standard of care or the breach thereof, and the many subjects which I have previously noted.  Given this method of direct examination of the expert witness who repaired the injury suffered by the plaintiff, I remain convinced that the cross-examination conducted by [defendants' attorney] which was stricken by the [c]ourt was clearly outside the scope of direct and was clearly not permissible by reason of a contention that the plaintiff[] somehow opened the door to all of these inquiries by asking about whether certain articles or a certain article was authoritative.

I want to be clear in my remarks.  I think [defendants' attorney] suggested that the questions posed by the plaintiff's attorney on the subject of 'the articles opened the door a wee bit or a tiny bit' and I don't think so.  I don't think it was opened even a crack."

"A trial court abuses its discretion only if it 'act[s] arbitrarily without the employment of conscientious judgment, exceed[s] the bounds of reason and ignore[s] recognized

principles of law [citation][,] or if no reasonable person would take the position adopted by the court.'" <u>Schmitz v. Binette</u>, 368 Ill. App. 3d 447, 452, 857 N.E.2d 846, 851 (2006), quoting <u>Popko v. Continental Casualty Co.</u>, 355 Ill. App. 3d. 257, 266, 823 N.E.2d 184, 192 (2005). The trial court's analysis of this issue is a thorough, articulated, detailed, and well-reasoned ruling that is firmly rooted in the prevailing law. Clearly the court's well-reasoned explanation of its ruling is not arbitrary. Furthermore, the trial court's decision that defendants' cross-examination went beyond the scope of plaintiff's direct examination is correct and does not constitute an abuse of discretion.

## B. Dr. Strasberg's Cross-Examination Was Permissibly Barred From Being Introduced as Direct Examination in Defendants' Case in Chief

Defendants argue that even if their cross-examination of Dr. Strasberg was impermissible as cross-examination, they should have been able to use Dr. Strasberg's cross-examination testimony in their own case in chief. Addressing this issue in defendants' posttrial motion, the trial court held:

> "My understanding of the appropriate procedure under such circumstances is simply this. For the plaintiff's attorney in my judgment so clearly and evidently steers clear of asking questions on the surgical

- 23 -

procedures, the standard of care, and any claim reached or the standard of care, he [sic] defense attorney has to know that under our procedures, he or she is not going to be able to make inquiry about--into those subjects on cross.

That he or she then has the option[] under our applicable rules to proceed pursuant to the notice that was given regarding the scheduling of the evidence deposition to take the doctors [sic] deposition for the defendants [sic] use during their case-in-chief. This does not appear to involve any particular additional expenditure of time. I note that Rule 206(b) provides 'that when a notice of the taking of a deposition has been served, any party may take a deposition under the notice, etc.' In plain English, I think it was abundantly clear that the plaintiff's attorney was not going to touch on certain subjects during the direct examination of the doctor in which case the defendant's [sic] attorney could proceed to take the deposition of the doctor

at the same time and place and correct--and proceed to conduct a direct examination of the doctor with regard to the various subjects which were, in my opinion, outside the scope of the cross-examination.

I have also noted Rule 206(c)(2) which says, 'the examination and cross shall be the same as though the deponent was testifying at trial.' I can only tell you in this regard if Dr. Strasburg had been testifying at trial, I would have made the same rulings. I would have barred the cross-examination and I think the defendants would have had the same option to take the direct examination of the doctor on subjects which were not covered during the plaintiff's direct."

Supreme Court Rule 212(c) states that when a party admits only a part of a deposition into evidence, the other party may then use any other part of that deposition "which ought in fairness to be considered in connection with the part read or used." 210 Ill. 2d R. 212(c). "An evidence deposition is not the 'property' of the party who takes it, and any portion of an evidence deposition may be offered by either side." Prince v. Hutchinson, 49 Ill. App. 3d 990, 995, 365 N.E.2d 549, 552 (1977)

- 25 -

(finding that the portion of the deposition not admitted was permissibly excluded by the trial court on the grounds that it was an impermissibly hypothetical question posed to the witness), citing <u>Dobkowski v. Lowe's, Inc.</u>, 20 Ill. App. 3d 275, 314 N.E.2d 623 (1974).

The trial court's ruling that defendants' cross-examination was "clearly" beyond the scope of plaintiff's direct examination serves to inform this court that Dr. Strasberg's cross-examination, which defendants sought to admit, was based on the trial court's assessment of fairness to the parties. Cross-examination during an evidentiary deposition must be conducted the same as though the deponent were testifying at trial. <u>Dobkowski</u>, 20 Ill. App. 3d 275, 314 N.E.2d 623. In <u>Dobkowski</u>, the court stated:

> "We believe that a party receives an unfair advantage if he introduces an evidence deposition in which he had the right to cross-examine the deponent while the other party was restricted to direct examination. A party who takes an evidence deposition, therefore, should have the opportunity to use the deposition in his case." <u>Dobkowski</u>, 20 Ill. App. 3d at 279, 314 N.E.2d at 626-27. Rule 212(c) does not state that when one party admits

part of a deposition the other party automatically gets to admit any other part of the deposition it chooses regardless of content. Rather, the rule states that the other party is entitled to admit parts of the deposition that should be considered "in connection with the part read or used." 210 Ill. 2d R. 212(c). In this case, the trial court found that the cross-examination testimony was barred because it was beyond the scope of plaintiff's direct. It is inherent in the court's ruling that the part defendants sought to admit was not "connected" to the part of the deposition that was admitted. Therefore, refusing to allow defendants' cross-examination of Dr. Strasberg to be admitted separately as direct examination is not a violation of Rule 212(c).

Defendants argue that the form of the questions should not preclude using the cross-examination of Dr. Strasberg in their case in chief. Defendants contend that they did not need to establish Dr. Strasberg as a defense witness by asking his name, background, training, and experience at the close of plaintiff's examination. However, defendants chose to cross-examine Dr. Strasberg instead of conducting their own direct examination. The trial court's decision not to allow defendants' cross-examination to be entered into evidence as direct testimony in their case in chief does not, as defendants contend, emphasize form over substance. The questions defendants posed to Dr.

Strasberg were leading questions consistent with the form of questions allowed on cross-examination. These types of questions are not allowed on direct examination.

Since the trial court's decision to grant plaintiff's objection to defendants' cross-examination of Dr. Strasberg was proper, this court does not need to address the issue of whether defendants were prejudiced by the trial court's ruling. Defendants apparently chose not to depose Dr. Strasberg directly. Defendants should not be allowed to present evidence that is otherwise inadmissible because they elected not to depose a witness. The trial court's ruling to prohibit Dr. Strasberg's cross-examination testimony to be used as evidence in defendants' case in chief avoids an unfair result.

### C. Plaintiff's Questions to Dr. Kadowaki Regarding Standard of Care Were Permissible

Defendants argue that plaintiff's cross-examination of Dr. Kadowaki was improper. The trial court's decision to allow plaintiff to question Dr. Kadowaki over defendants' objection is reviewed by this court for abuse of discretion. Leonardi, 168 Ill. 2d at 92, 658 N.E.2d at 454.

Defendants first objected to plaintiff's question, "Okay. And so, Dr. Strasberg and Dr. Soper [(Dr. Strasberg's former partner)] described, advocated, and wanted everybody to use the critical view of safety technique, correct?" The trial court overruled defendants' objection and allowed Dr. Kadowaki to

- 28 -

answer plaintiff's question.  A few questions later, plaintiff asked Dr. Kadowaki, "And they advise others to abandon your technique, is that wrong?"

Defendants argue that plaintiff's questions regarding Dr. Kadowaki's personal preferences were in violation of point VI of defendants' motion in limine, which the trial court had granted prior to trial.  During the pretrial hearing on defendants' motion in limine, plaintiff objected to the motion, stating that it was plaintiff's position that inquiries into defendants' expert's personal practices were allowed for the purpose of credibility during cross-examination and to test the expert's opinion.  Defense counsel responded:

> "My concern was, more less [sic], with direct examination, especially of Dr. Vasquez *** I don't really have a quarrel with the Gallina [ v. Watson, 354 Ill. App. 3d 515, 821 N.E.2d 326 (2004)] case that is cited *** [i]t is well-reasoned law ***.  Gallina says that, on cross-examination, if a witness has said standard of care allows a certain procedure to be done a certain way, then the witness can be questioned, 'Well, don't you yourself prefer a different way.'  I don't have a problem with that.  But, that is something on

cross[-]examination [sic] as it relates only to credibility."

The trial court granted defendants' motion in limine stating, "In granting this, I am certainly not precluding cross-examination as suggested in colloquy here that was designed to impeach a witness, but I am granting the motion to preclude a witness on direct from saying, this is how I do it."

In this case, the testimony of Dr. Kadowaki on direct seemingly violates defendants' own motion in limine. Dr. Kadowaki not only testified as to his personal practices and preference but, over plaintiff's objection, defendants presented a DVD of Dr. Kadowaki performing a cholecystectomy. During the video, defendants would pause the DVD, and Dr. Kadowaki would explain to the court what structures were being viewed and what actions he was taking as part of the surgery. Defendants contend that the DVD's purpose was purely to inform the jury of the actual view the doctor has of the structures while she performs the surgery.

Additionally, Dr. Kadowaki specifically cited Dr. Strasberg's approval of the "critical[-]view" technique to perform cholecystectomies. The trial court found that during his direct examination Dr. Kadowaki testified to the following:

"1. The technique he uses to identify the cystic duct;

2. What active surgeons do and don't do;

3. What he doesn't do anymore;

4. That he doesn't do what another surgeon recommends;

5. The techniques he used in the film presentation of his surgical procedure;

6. What his practice is;

7. What practice he employs to identify the cystic duct;

8. That a certain procedure to identify the cystic duct is not described in any textbook or paper, and is, therefore, in his opinion, unnecessary;

9. An accepted technique to identify the cystic duct, known as 'the critical view,' has been talked about by Dr. Strasberg;

10. His practice is to warn patients of possible injuries to structures near the gallbladder;

11. In his personal experience, pancreatic tissue has been removed with the gallbladder and reported by the pathologist."

The trial court ruled:

"The foregoing testimony offered by the

defendants during the direct examination of their expert clearly conveyed to the jury the personal practices of that expert, his disinclination or refusal to do what another surgeon recommends or what no paper or textbook discusses, an accepted technique discussed by another surgeon and writer (Dr. Strasberg), his practice regarding warnings to his patients, his experience regarding warnings to his patients, his experience regarding the removal of pancreatic tissue in connection with his own surgeries, and more. *** Given this presentation, the [p]laintiff was entitled to fully explore what other practices or procedures, discussed or written about, the expert does or does not follow. *** The court is of the opinion that this cross[-]examination was fair, given the presentation on direct, even without consideration of <u>Gallina</u>. With consideration of <u>Gallina</u>, it was a fair approach to test the 'credibility and persuasive value' of the expert's opinions."

Defendants' motion <u>in</u> <u>limine</u> prohibited plaintiff from

- 32 -

establishing a <u>prima</u> <u>facie</u> case of negligence based on the testimony of what another physician would have done differently. However, an expert's testimony on personal preference, such as Dr. Kadowaki's, is not <u>per</u> <u>se</u> inadmissible. <u>Gallina</u>, 354 Ill. App. 3d at 521, 821 N.E.2d at 331. Testimony regarding personal preference is admissible if it addresses issues of the witness's credibility and the persuasiveness of the expert's testimony. <u>Gallina</u>, 354 Ill. App. 3d at 521, 821 N.E.2d at 331. By referencing Dr. Strasberg's approval of Dr. Kadowaki's own preferred technique during his direct examination, defendants opened the door to questions regarding Dr. Kadowaki's knowledge of Dr. Strasberg's views on cholecystectomy techniques. Therefore, the trial court's ruling on defendants' objection to plaintiff's questions during cross-examination was correct.

D. The Record Does Not Support Defendant's Claim That Articles or Treatises Were Presented to the Court as Substantive Evidence

Dr. Kadowaki referred to Dr. Strasberg's critical-view technique on direct examination when he said that Dr. Strasberg has been associated with the critical-view technique. During cross-examination of Dr. Kadowaki, plaintiff asked him questions regarding Dr. Strasberg's critical-view technique, which Dr. Strasberg had not testified about. Defendants argue that plaintiff's cross-examination impermissibly allowed a publication authored by Dr. Strasberg to be used as a substitute for direct testimony.

While defendants did raise this issue in their posttrial motion, no objection related to this issue was made at the time of trial.  To preserve an issue for appeal, the party must both make an objection at the time of trial and in a posttrial motion.  Kim, 240 Ill. App. 3d at 892, 608 N.E.2d at 378.  In this case, the record does not support defendants' contention that plaintiff's attorney was waving the article around during Dr. Kadowaki's cross-examination.  Defendants claim that the trial court and jury were fully aware of the article to which plaintiff was referring when he asked about Dr. Strasberg's opinions.  However, nothing in the record reflects plaintiff's alleged use of the article in the courtroom, and defendants make no specific reference to any portion of the record that supports their contention.  Furthermore, nothing in the transcripts suggest to this court that any text of an article was read and/or admitted into evidence.

Regardless, an expert may be cross-examined with literature that he relied on if that literature is used to impeach that witness.  The supreme court adopted Federal Rule of Evidence 703 in Wilson v. Clark, 84 Ill. 2d 186, 196, 417 N.E.2d 1322, 1327 (1981).  People v. Munoz, 348 Ill. App. 3d 423, 443, 810 N.E.2d 65, 80 (2004) (noting that in 1981 when the supreme court adopted Rule 703, it read, "'The facts or data in the particular case upon which an expert bases an opinion or

inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence'"), quoting Fed. R. Evid. 703. Facts that are relied upon by the expert in his case in chief are permissible grounds for cross-examination. Rios v. City of Chicago, 331 Ill. App. 3d 763, 773, 771 N.E.2d 1030, 1038 (2002). Dr. Kadowaki's reliance on Dr. Strasberg's approval of the critical-view method in his direct opened the door for plaintiff's questions regarding methods condoned and condemned by Dr. Strasberg. Interestingly enough, when plaintiff asked Dr. Kadowaki whether Dr. Strasberg disapproved of Dr. Kadowaki's preferred technique, which was the infundibular method, Dr. Kadowaki answered "no."

Plaintiff's questions concerning Dr. Strasberg's method were not being offered to prove the truth of the matter asserted, and were not inadmissible hearsay. People v. Pasch, 152 Ill. 2d 133, 176, 604 N.E.2d 294, 311 (1992), cert. granted, 508 U.S. 959, 124 L. Ed. 2d 678, 113 S. Ct. 2927 (1993), order vacated by 510 U.S. 910, 126 L. Ed. 2d 245, 114 S. Ct. 337 (1993) (stating that petitioner died in Pontiac, Illinois).

In this case Dr. Kadowaki relied on Dr. Strasberg's opinion explicitly in his direct examination. The supreme court in Pasch held, "Clearly, if an expert admits relying upon a

report, that party may be impeached with the contents of that report." Pasch, 152 Ill. 2d at 178, 604 N.E.2d at 312. However, no specific article of Dr. Strasberg's was referenced by Dr. Kadowaki when he testified about Dr. Strasberg's opinion during direct examination. Similarly, plaintiff's cross-examination only involved general references to Dr. Strasberg's techniques. Therefore, no error occurred regarding an alleged article being used on cross-examination of Dr. Kadowaki when no specific article is referenced in the record or in the parties' argument on appeal.

### III. CONCLUSION

Therefore, based on the foregoing reasons, we find that the trial court's evidentiary rulings in this case did not constitute an abuse of the trial court's discretion, and we affirm.

Affirmed.

APPLETON and McCULLOUGH, JJ., concur.