NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190685-U

NO. 4-19-0685

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 20, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MARC WILSON and SANDY WILSON, | ) | Appeal from the |
|     Plaintiffs-Appellants, | ) | Circuit Court of |
|     v. | ) | Champaign County |
| ROBERT S. SCHAEFER, | ) | No. 08L133 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey Ford, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Plaintiffs have failed to establish the incomplete record requires a new trial.

(2) By not objecting during *voir dire* questioning of a prospective juror after the juror's responses indicated possible deceit and bias, plaintiffs forfeited the argument the trial court erred by denying a peremptory challenge after the juror was sworn in.

(3) Plaintiffs failed to establish reversible error in the trial court's imposition and enforcement of *in limine* orders.

¶ 2    In August 2004, plaintiff, Marc Wilson, underwent hip-replacement surgery. As a result of that surgery, Marc suffered permanent sciatic-nerve damage and foot drop. Approximately two years later, Marc and his wife, plaintiff Sandy Wilson, filed suit against his surgeon, defendant Robert Schaefer, M.D., and defendant's employer, Christie Clinic. Plaintiffs

alleged defendant failed to inform Marc a risk of his surgery was nerve damage. After a trial, the jury found in defendant's favor. Plaintiffs appeal, arguing (1) the incomplete record requires a new trial, (2) the trial court abused its discretion when it prevented plaintiffs from using a peremptory strike on a biased and dishonest juror, and (3) the trial court's changing rulings on overbroad motions *in limine* resulted in an unfair trial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4           Marc suffered from degenerative arthritis in his right hip. In July 2004, Marc, at age 53, met with defendant to discuss hip arthroplasty, also known as hip replacement. Marc consented to the surgery, which defendant performed in August 2004. During surgery, Marc's sciatic nerve was damaged, causing permanent damage to Marc's right foot. In August 2006, plaintiffs filed suit against defendant and his employer, seeking damages under the doctrine of informed consent. Plaintiffs amended the complaint, adding claims defendant was negligent in failing to determine the etiology of the sciatic nerve palsy and in attempting to resolve the condition. Plaintiffs added another claim based on *res ipsa loquitor*, asserting the type of injury that occurred did not occur in the absence of negligence. The added claims were dismissed as untimely. This court affirmed the dismissal. See *Wilson v. Schaefer*, 403 Ill. App. 3d 688, 695-97, 941 N.E.2d 870, 876 (2009) (*Wilson I*).

¶ 5           This appeal involves only the claim of informed consent. It also involves just one defendant, as, before jury selection, plaintiffs and Christie Clinic entered into a settlement agreement. Plaintiffs allege Dr. Schaefer failed to inform Marc of the risk of damage to his sciatic nerve and foot drop and, had Marc been informed of the risk, he would not have elected to undergo surgery.

¶ 6          A. Pretrial Discussion Regarding Recordings of Sidebars

¶ 7          At the end of a discussion regarding *voir dire* proceedings, the following

exchange occurred regarding the recording of sidebar discussions:

> "[PLAINTIFFS' COUNSEL]: *** Are our sidebars even
>
> recorded, Judge, or no, in your—
>
> THE COURT: They, they should be.
>
> [PLAINTIFFS' COUNSEL]: Okay. Well, then I won't
>
> go—
>
> THE COURT: But you, you can make your record now.
>
> I press the sidebar button, which means that it's—that
>
> everything else should remain in effect—
>
> [PLAINTIFFS' COUNSEL]: Okay, I didn't know if that
>
> was—
>
> THE COURT:—and just give them white noise, but you
>
> can—
>
> [PLAINTIFFS' COUNSEL]: That's—
>
> THE COURT:—whatever you wish."

¶ 8          After the trial concluded, plaintiffs requested trial transcripts and learned, upon

receiving those transcripts, the sidebars were not transcribed. Plaintiffs, in March 2019, sought

an order authorizing the transcription of sidebars and an extension to file a posttrial motion. The

motion was denied. The court held plaintiffs could put forth any argument in their posttrial

motion as to why any sidebar should be transcribed and the trial court could decide the matter

then.

¶ 9                                    B. *Voir Dire* Proceedings

¶ 10            On December 3, 2018, *voir dire* questioning began. Before jury selection, the

following discussion was held:

> "THE COURT: Mm-hmm. And I will do the four at a time,
>
> you'll do four at a time, and they'll do four at a time.
>
> [PLAINTIFFS' COUNSEL]: Oh, questioning by panels?
>
> THE COURT: By panel, four at a time. The first front row
>
> two and the back row two, we'll do them. ***
>
> [PLAINTIFFS' COUNSEL]: Two alternates, I assume it's
>
> five perempts?
>
> THE COURT: Yes."

¶ 11            The trial court summarized for the prospective jurors the statement of the case,

informing jurors plaintiffs have alleged defendant "failed to disclose those risks that a reasonably

well qualified orthopedic surgeon would have disclosed to Marc;" defendant's "failure to

disclose those risks was an approximate cause of the injury to Marc;" Marc "sustained a nerve

injury resulting in foot drop as a result of the right total hip replacement surgery;" and, if Marc

"had been informed of the risk of a nerve injury resulting in foot drop Marc *** would not have

submitted to the surgery and that a reasonable person in his situation would not have undergone

the surgery."

¶ 12            After *voir dire* questioning of the first panel, plaintiffs' counsel stated, "Those are

all my questions, Judge." The court asked, "Tender the panel?" Plaintiffs' counsel responded, "I

tender the panel to Doctor Schaefer." After defense counsel questioned the panel, defense counsel informed the court it would accept the panel. The trial court addressed the panel. Just after the court said, "With that said, we're going to have you sworn in," an "unidentified male speaker" asked to approach the bench:

> "UNIDENTIFIED MALE SPEAKER: Could we approach, Judge?
>
> THE COURT: Sure.
>
> UNIDENTIFIED MALE SPEAKER: Are we supposed to exercise our peremptories (unintelligible)?
>
> THE COURT: Before you tender them to the other side, yeah.
>
> UNIDENTIFIED MALE SPEAKER: (Unintelligible.)
>
> THE COURT: Huh?
>
> UNIDENTIFIED MALE SPEAKER: We have to make objections based on our own questioning (unintelligible)?
>
> THE COURT: Yeah.
>
> UNIDENTIFIED MALE SPEAKER: Okay. Thank you.
>
> THE COURT: Sure."

The first panel was sworn.

¶ 13        Juror Wentworth was in the second panel to appear before the court. As to this panel, the trial court began by questioning the prospective jurors. After the court asked Wentworth if there was anything about the case that would prevent him from being fair and

impartial, Wentworth responded, "Your Honor, just probably pertinent to say that I have not heard loud and clear everything that has been said, particularly by the attorneys."

¶ 14　　　Plaintiffs' counsel began questioning the second panel of four prospective jurors. One of the questions counsel posed was, "Have any of you had a hip surgery?" Two jurors, referred to as "unidentified prospective juror," said, "No."

¶ 15　　　Before tendering the second panel to defendant, plaintiffs' counsel asked to be heard, objecting to the process by which plaintiffs had to exercise their peremptory challenges before defendant questioned prospective jurors. Plaintiffs' counsel stated he wanted to make a record of his objection to preserve the error. The trial court agreed to allow plaintiffs' counsel to preserve the issue until the end of the day.

¶ 16　　　Plaintiffs' counsel also asked to get hearing assistance for Wentworth. The trial court said that could be done. In this discussion, counsel from both sides acknowledged Wentworth would not be able to hear them. Plaintiffs' counsel stated, "I was screaming and he couldn't hear me." The trial court disagreed counsel was screaming and denied the request to dismiss Wentworth for cause. Plaintiffs' counsel did not use a peremptory challenge for Wentworth. The panel was tendered to the defense.

¶ 17　　　Defense counsel questioned the panel. During questioning, counsel asked, "Have any of you or a close family member had surgery?" After hearing affirmative responses, defense counsel began questioning the jurors individually, beginning with Wentworth. Counsel asked what kind of surgery he had. Wentworth responded, "Well, gallbladder, appendix and a pacemaker. That kind of thing." The following questioning then occurred:

> "[DEFENSE COUNSEL]: Okay. And did any health[-]care

provider talk to you about the specific risks of those procedures before you had them?

MR. WENTWORTH: I guess I should have mentioned hip surgery.

[DEFENSE COUNSEL]: Okay. When did you have hip surgery?

MR. WENTWORTH: It's a little over ten years.

[DEFENSE COUNSEL]: Was it a hip replacement?

MR. WENTWORTH: Yes.

[DEFENSE COUNSEL]: Did you have any complications from that procedure?

MR. WENTWORTH: No."

¶ 18    Later in questioning, defense counsel asked "if a physician has been sued for reasons related to health care, in this case for the informed[-]consent discussion, do you have any problem with the physician coming to court and defending himself?" The record lists the person who responded as "Unidentified prospective juror." That juror's response was, "Heck, no."

¶ 19    At the close of defense counsel's questions, defense counsel indicated it would accept the panel. The trial court then addressed the panel, telling them the time to return. The court reminded them not to talk to anyone about the case. The court then asked the four to stand, and the jurors were sworn.

¶ 20    The trial court discussed with counsel the number of prospective jurors it would ask to return the next day and that it would release the others. After the parties agreed to the trial

court's proposal, the court addressed the prospective jurors. Before ending the day, plaintiffs' counsel raised an issue regarding exhibits. The court said the following: "We have some people upstairs who should be leaving now 'cause they're working well over time, so if you want to bring up some things that came up in jury selection and want to make a record of them why don't we come back at 8:45 in the morning and we can have the jurors wait outside for a minute and take that up and then they can come on in."

¶ 21    The following day, the trial court began proceedings by asking if counsel had an issue to raise. Plaintiffs' counsel responded affirmatively. After asking about other jurors, plaintiffs' counsel stated the following:

"[PLAINTIFFS' COUNSEL]:The second thing, and the reason I've said I wanted to be heard, yesterday, at the end of the plaintiffs' questioning of the second panel, I asked the court, and you said, you know, we'll take it up this morning without waiving the error, plaintiffs object to the requirement that plaintiffs have to exercise their peremptories at the close of plaintiffs' questioning of the jurors before the defendant has questioned. It allows the defendant—and, and that's true so far of every panel, I presume it would [be] true of the third panel, it allows the defendants to have more information. ***

As an example, yesterday I know the court asked questions of a group, and [plaintiffs' counsel] asked questions, and it's not until [defense counsel] was asking questions, and, in fact, I think—

I don't have it memorized—I think that [defense counsel] even asked about hip replacements and then was asking about other surgeries when Mr. Wentworth says, oh, maybe I should mention I've had hip replacements, which is something we all would have liked to have known about, and the plaintiff would have liked to have known about during questioning and would like to have known about it before deciding to exercise their peremptory challenges.

I believe it was also Mr. Wentworth when there was a question to the effect of should a doctor be able to present his side of the testimony who emphatically said heck yeah, of which brought some laughter in the courtroom, but also was a strong indication of *** feelings that he has on that point.

* * *

THE COURT: [Defense counsel?]

[DEFENSE COUNSEL]: Yes, Your Honor.

I, I think the court's procedure for selecting a jury is customary. It's not just in this courtroom, but many other courtrooms I've been where it has been done in a similar fashion. The plaintiffs have not been limited whatsoever in their, their questioning, the scope of question[s], the time they've been allowed to question like some courts do limit that time, but the

plaintiffs in this courtroom and the way this procedure works have been given as much as time as they want thus far to fully question each and every witness, and the fact that they chose to not inquire concerning the specific procedure in question of the jury, that's a choice and a strategy and they chose not [to] do that in questioning these witnesses about whether they had a hip replacement. And I, I don't think there's any basis to reopening the questioning of the, the second panel or in addressing Mr. Wentworth. I believe they've had adequate opportunity."

¶ 22 The trial court denied plaintiffs' request to alter the process and to peremptorily dismiss Wentworth. The court refused to surmise Wentworth intentionally misled counsel. The court noted jurors often have their memory refreshed during questioning. The court further found it was halfway through jury selection and nothing it heard indicated the jurors could not be fair and impartial.

¶ 23                    C. Motions *in  Limine*

¶ 24                    1. *Evidence on Marc's Option to Delay Surgery*

¶ 25 At a pretrial conference, defendant sought an order *in limine* barring evidence and any suggestion delaying surgery was an option relevant to the issue of informed consent. Defendant argued the only testimony about delaying surgery was an expert's deposition in which the expert opined there were studies suggesting a delay in surgery makes the outcome less desirable. Defense counsel pointed to the Illinois Pattern Jury Instructions and said the question of damages was dependent on the question of whether Marc would or would not have had the

surgery. According to defendant, if Marc's position is that he would have delayed the surgery, then he admits he would have had the surgery and his claim fails.

¶ 26    Plaintiffs' counsel argued their position would be that Marc could have proceeded with medication and he could have gotten more injections. Plaintiffs' counsel agreed he would not argue a different outcome would have occurred if the surgery had been delayed.

¶ 27    The trial court granted defendant's motion, barring any suggestion delay of the surgery would have had any effect on the surgery's outcome. Plaintiffs clarified they could say the option was for him to deny surgery.

¶ 28        2. *Evidence Regarding Expert Testimony on Personal Practice*

¶ 29    In November 2018, Christie Clinic filed a motion *in limine* seeking to bar, in part, evidence that other physicians would have acted differently than defendant. Christie Clinic argued such statements were irrelevant to the issue of standard of care, as a difference of opinion is not evidence of a violation of the applicable standard of care. The court allowed this motion.

¶ 30    Christie Clinic further asked the court to bar plaintiffs from introducing evidence of various methods of obtaining informed consent. Christie Clinic emphasized a number of witnesses had testified in their depositions regarding their method of obtaining informed consent for hip surgery but all had agreed if defendant verbally advised Marc of the possibility of nerve damage, he was not negligent.

¶ 31    The trial court concluded it would grant this motion as there was no evidence suggesting the standard of care required giving Marc written notice of the risks.

¶ 32        3. *Evidence on "What's Not in the Chart"*

¶ 33    Christie Clinic sought an order barring plaintiffs from introducing evidence or

inferring defendant failed to chart, failed to chart appropriately, or failed to document in Marc's medical records data or summaries. Christie Clinic argued such evidence was irrelevant given there was no expert opinion an alleged defect in charting causally related to the alleged injuries and the prejudicial effect outweighed the probative value.

¶ 34    In contrast, plaintiffs argued, given the dispute over whether defendant informed Marc of the risk, the evidence of what was not in the chart was circumstantial fact. No listing of such a statement supported Marc's contention he was not told of the risk of sciatic-nerve injury.

¶ 35    The trial court agreed with plaintiffs, stating the absence in the record did not show there was anything wrong with the charting. The court found plaintiffs should be able to place the chart into evidence.

¶ 36    Early in plaintiffs' opening statement, plaintiffs showed the jury a blowup of defendant's chart documenting his pre-surgery discussion with Marc. Plaintiffs stated defendant would "tell you he has no recollection of discussing those *** alternatives with Marc" and will likely, "in his routine, he would have discussed in some fashion the idea that there could be a nerve injury to the nerves." As plaintiffs began to state, "there is no reference ***," defendant objected saying he believed plaintiffs cannot say what is in the chart. The trial court clarified plaintiffs can say what was charted but not what was not in the chart: "What's not in the chart cannot be stated, but what is in the chart can be stated." Plaintiffs' counsel continued by telling the jury, "You'll see in the chart what is stated. And you'll see that in terms of the discussion of potential complications or discussion of risks the entirety of what is stated is a discussion about the three different kinds or three different types of artificial hip. *** And that's what's stated."

¶ 37    Further discussion occurred before the trial court. The trial court held, "You can

- 12 -

get into some of the chart and anything that is a reasonable inference from that can be argued.

Whether it's—whether it's that relevant to your issues is a question, but it's still part of the chart.

So that's the ruling."

¶ 38                    4. *Evidence on the Incidence of Foot Drop*

¶ 39            Christie Clinic asked for an order barring plaintiffs from mentioning other

defendant's patients who suffered complications. Plaintiffs opposed the motion, arguing the

evidence goes to defendant's expertise and knowledge and the need to inform about it. Plaintiffs

further maintained the evidence goes toward expert testimony on whether Marc's condition was

permanent or worsening. Defendant argued the fact that someone had something similar happen

"was universally recognized by all the experts that this can happen." Defendant maintained such

evidence would merely be an attempt to suggest defendant was not a good doctor, which was not

proper in the informed-consent case.

¶ 40            The trial court agreed with defendant and Christie Clinic, concluding the jury

would be told of the known complications and it would be irrelevant to talk percentages about

whether it would happen.

¶ 41            Plaintiffs made offers of proof relevant to the grant of the motion *in limine*.

Defendant would have testified the incidence of foot drop as a complication is around 1% and

fewer than six of his patients developed foot drop from hip surgery. The complication resolved

for some but was permanent for others. Dr. Randall Smith, in his offer of proof, testified the

incidence of foot drop from hip surgery was 1% to 3%; Dr. Paul Lux stated the incidence was

between 0% and 3%.

¶ 42                                    D. Trial

- 13 -

¶ 43     The trial was held from December 4 to December 11, 2018. The trial court tendered plaintiffs' proposed issue instruction for informed consent, which states, in part, the elements of plaintiff's informed consent claim:

> "The plaintiff Marc Wilson claims that the defendant, Robert Schaefer failed to inform the plaintiff of those risks of the right total hip arthroplasty which a reasonably well-qualified orthopedic surgeon would have disclosed under the same or similar circumstances;
>
> The plaintiff further claims that if the defendant had disclosed those risks a reasonable person in the plaintiff's position would not have submitted to the right total hip arthroplasty; and
>
> The plaintiff claims that he was injured, and that the defendant's failure to disclose those risks was the proximate cause of that injury."

Plaintiffs further provided the instruction defining defendant's duty to plaintiff and the definition of informed consent:

> "When I use the expression 'informed consent' I mean a consent obtained from a patient by an orthopedic surgeon after the disclosure by the orthopedic surgeon of those risks of the proposed treatment which a reasonable well-qualified orthopedic surgeon would disclose under the same or similar circumstances. A failure to obtain informed consent is professional negligence.

The phrase 'deviation from the standard of care['] means

the same thing as 'professional negligence.' "

¶ 44　　　　The jury rendered a verdict for defendant.

¶ 45　　　　　　　　　　E. Posttrial Motion

¶ 46　　　　Plaintiffs filed a motion for a new trial. The trial court, in a 26-page ruling, denied the motion.

¶ 47　　　　This appeal followed.

¶ 48　　　　　　　　　　II. ANALYSIS

¶ 49　　　　　　　　　　A. Incomplete Record

¶ 50　　　　Plaintiffs first argue reversal is required as the trial court misled them into believing a complete record was being made for review. Plaintiffs emphasize they asked the trial court during *voir dire* if sidebars were recorded, which, according to plaintiffs was the same as asking if the sidebars were on the record. Plaintiffs' argument acknowledges the sidebars were recorded but contends "the sidebar transcripts here are much worse than what one would normally expect." Plaintiffs contend "speakers are misidentified and stretches of argument are unintelligible."

¶ 51　　　　Defendant emphasizes the sidebars were recorded and transcripts of those sidebars were obtained. Defendant further points out plaintiffs supplemented the record with those transcripts.

¶ 52　　　　Plaintiffs' argument fails on multiple grounds. First, plaintiffs, by not citing the record for examples of these errors, have forfeited the argument. Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) requires argument be supported by citation to "the pages of the

record relied on" and supporting authority. Plaintiffs contend multiple errors occurred but then, in effect, asks this court to search the record and find those errors. We will not do so. Plaintiffs also provide no case law showing transcription errors require reversal. Moreover, plaintiffs have not established any error by the trial court. The sidebar communications were recorded, just as the trial court said they would be. Although transcription of those communications was not initially provided with the rest of the trial record, it later was. This is not an instance where, as in plaintiffs' case *Schulz v. Rockwell Manufacturing Co.*, 108 Ill. App. 3d 113, 120, 438 N.E.2d 1230, 1235 (1982), the trial court's refusal to grant discovery or hold further hearings, precluded the ability to provide a bystander record. Last, plaintiffs have made no effort to establish prejudice. A reversal cannot be obtained without proof of prejudice by the error. *McNeil v. Ketchens*, 2011 IL App (4th) 110253, ¶ 22, 964 N.E.2d 66. Plaintiffs simply say the transcription was "worse than one would expect." That is insufficient.

¶ 53                                    B. Jury Selection

¶ 54            Regarding *voir dire*, plaintiffs appear to intermingle two distinct claims of error. In their opening brief, plaintiffs' heading asserts the trial court abused its discretion when it prevented them from using a peremptory strike on Wentworth, "a biased and dishonest juror." The *voir dire* heading in their reply brief, however, touches on the argument raised in the trial court based on the unfair *voir dire* process and pointing to the admission of Wentworth as "prejudice" resulting from that error: "The trial court's limitation on plaintiffs' use of peremptory strikes prejudiced plaintiffs."

¶ 55            We will address both arguments separately, beginning with the one that first appears in the trial court record—plaintiffs' challenge to the *voir dire* process.

¶ 56        After the first panel was questioned and before the prospective jurors were sworn,

plaintiffs' counsel clarified with the trial court that it was to use its peremptory challenges before

tendering the panel to defendant. Before questioning of the second panel began, plaintiffs'

counsel challenged the process by which jury selection was to occur, arguing it was unfair that

plaintiffs had to make a decision on its own questioning of the prospective jurors while

defendant had the benefit of hearing plaintiffs' questioning and its own questioning. The trial

court found no reason to abandon the practice his court had employed for over 30 years and

noted there were no limits on the questions plaintiffs could ask.

¶ 57        Plaintiffs objected to the process again after Wentworth was sworn in with his

panel. Plaintiffs pointed to Wentworth as evidence they were prejudiced by the process. The trial

court adhered to its earlier ruling and determined the juror-selection process would continue the

same way.

¶ 58        On appeal, plaintiffs do not develop an argument the process was unfair or

improper. Instead, they rely solely on the argument they were prejudiced by Wentworth's

admission due to that process. Without proving trial-court error, prejudice is irrelevant and not

grounds for reversal. See generally *McNeil*, 2011 IL App (4th) 110253, ¶ 22 (showing error and

substantial prejudice are required for reversal).

¶ 59        Plaintiffs' remaining *voir dire* argument is the trial court improperly refused to

allow them to peremptorily strike Wentworth. This argument the plaintiffs developed in their

opening brief.

¶ 60        Due to the trial court's ruling on the posttrial motion, observing plaintiffs said

nothing when the inconsistency and alleged bias surfaced, plaintiffs attempt to establish they

have not forfeited this claim. Unfortunately, to support their claim they properly preserved the issue below, plaintiffs rely on their challenges to the *voir dire* process and not a specific challenge to Wentworth. For example, plaintiffs emphasize they repeatedly raised for the record their concerns about the process. They challenged the issue before Wentworth's panel was questioned and after they finished questioning that panel. Plaintiffs further emphasize the trial court allowed them to argue the issue the next morning. However, none of these challenges involved Wentworth and his inconsistent response to the parties' questions regarding surgery and hip surgery. Plaintiffs stood silent when Wentworth, during defendant's questioning, volunteered he should mention his hip surgery. Plaintiffs said nothing as questions continued and before the trial court swore in Wentworth and the rest of the panel. Instead of providing the trial court with the opportunity to allow further questioning of Wentworth to ascertain whether Wentworth heard plaintiffs' question regarding hip surgery, whether he chose to mislead plaintiffs, or whether Wentworth had a memory lapse, plaintiffs allowed the trial court to proceed with these jurors. There is no indication from the record the trial court would not have been receptive to a conversation about Wentworth before the panel was sworn in and the jury dismissed for the evening. Plaintiffs have forfeited this argument. *York v. El-Ganzouri*, 353 Ill. App. 3d 1, 12, 817 N.E.2d 1179, 1189 (2004) (holding the objecting attorney bore the burden to object at a time when the trial court could rectify the error).

¶ 61                                 C. Motions *in Limine*

¶ 62         Plaintiffs assert the trial court erred in allowing three motions *in limine* and in abandoning its analysis in denying another. In their brief, plaintiffs identify these motions as the following: (1) the motion *in limine* asking to bar evidence of "conservative treatment" and

- 18 -

"delay"; (2) the motion seeking to bar evidence of the expert's "personal practice"; (3) the motion seeking to bar evidence of information on the information not contained in Marc's chart, *i.e.*, "what's not in the chart" motions *in limine*; and (4) defendant's motion seeking to bar evidence of the percentage of surgeries that result in sciatic-nerve injury and foot drop.

¶ 63        As we review plaintiffs' arguments, we are mindful decisions on the admissibility of evidence fall within the trial court's sound discretion; we will not reverse an evidentiary ruling absent an abuse of that discretion. *Fakes v. Eloy*, 2014 IL App (4th) 121100, ¶ 82, 8 N.E.3d 93. This court will not find such a ruling to be an abuse of discretion unless no reasonable person would adopt the trial court's view. *Id.*

¶ 64        Before turning to these motions, we note plaintiffs make broad arguments of trial court error in their introductory paragraphs in the section of their brief challenging orders on motions *in limine*. Plaintiffs aver the court made "sweeping motions *in limine* on broad topics," pointing to one motion *in limine* that simply sought to bar "blatant hearsay." This is a misstatement. In support of this "argument," plaintiffs cite the court's use of the words "blatant hearsay." Contrary to plaintiffs' characterization, the court was not attempting to bar all hearsay by an order *in limine*. The court used the words as a basis for not admitting evidence. This argument fails.

¶ 65                    1. *Marc's "Conservative Treatment" Options*

¶ 66        In this "conservative treatment" section, plaintiffs argue the trial court erred in barring evidence of "conservative treatment" of Marc as an option to surgery. Plaintiffs, however, point to no order *in limine* or order during trial that prevented plaintiffs from presenting evidence on "conservative treatment," which involved no surgery. Plaintiffs instead misrepresent

the order *in limine* on "delaying treatment" as an order barring all testimony on conservative treatment. In fact, defendant did not seek to bar evidence of "conservative treatment" only "delay."

¶ 67        Plaintiffs point to one place in the record where they assert the trial court improperly changed enforcement of its order *in limine* to bar testimony on "conservative treatment." The portion plaintiffs rely upon involved a conversation among the parties and the court just before plaintiffs began to conduct redirect examination of Dr. Lux. Plaintiffs contend the trial court allowed defendant's "confusing request to bar 'any questioning about should [*sic*] have considered further additional conservative treatment or delay or so on.' " Plaintiffs argue that "further testimony from Dr. Smith on Marc's 'conservative treatment' options would violate an order *in limine*." The court ruled, "we're not going to go into again because it really is not an issue in this case."

¶ 68        Despite plaintiffs' characterization of this as a request to bar conservative-treatment testimony, this is not what the record shows. The above-quoted language of a "confusing request" originated from defense counsel, who was arguing, under Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018), evidence of conservative treatment was not disclosed: "I would just like to raise a 213 issue to any questioning about [*sic*] should have considered further about additional conservative treatment or delay or so on. That is not an opinion that has been disclosed that that was an option that he should have pursued or considered." After plaintiffs' counsel argued this was disclosed in the deposition, defendant argued, "It's either live with the pain or have the surgery I believe were the two options." After this statement, defendant's counsel reminded the court of the motion *in limine*. After argument before the court, when the

trial court stated, "we're not going to go into it again because it really is not an issue in this case," the trial court was referring to the issue of whether surgery could be delayed:

> "And at this point, going down and starting to ask again whether he could have waited—and there's already testimony in here, I believe, and I can't remember when or from whom, that yes, he could have—he could have waited and had the surgery. I mean, that's already out. You've already got that out, [plaintiffs' counsel], but we're not going to go into it again because it really is not an issue in this case."

¶ 69      Plaintiffs have failed to show the trial court changed its position. The trial court was consistent in denying testimony regarding "delay," and plaintiff has not pointed to any place in the record where testimony regarding Marc's ability to choose "conservative treatment" over surgery was barred.

¶ 70      We further note, to support his claim that an order *in limine* barring evidence Marc had the option of delaying surgery, plaintiffs point to this court's decision in *Wilson v. Schaefer*, 2014 IL App (4th) 131043-U, ¶ 52 (*Wilson II*), in which this court wrote, "The experts, while testifying hip replacement was in Marc's future, acknowledged Marc could choose other alternatives, such as continuing with therapy, delaying surgery, and simply living with the pain." In *Wilson II*, we overturned an order of summary judgment in defendant's favor upon concluding a genuine issue of material fact existed as to whether a reasonable person in Marc's position would have undergone the surgery had he been informed of the risk. *Id.* This sentence states only that the experts acknowledged these options. This court did not hold the option to "delay

- 21 -

surgery" was admissible given the evidence and arguments before the trial court. Plaintiffs' reliance on this paragraph is misplaced.

¶ 71                                    2. *Personal Practice*

¶ 72          Regarding the personal-practice motion *in limine*, plaintiffs assert the motion was improperly granted and inconsistently applied. In support of their contention the personal-practice testimony should have been allowed, plaintiffs rely on our decision in *Adams v. Sarah Bush Lincoln Health Center*, 369 Ill. App. 3d 988, 1004, 874 N.E.2d 100, 114 (2007). According to plaintiffs, *Adams* establishes "[t]estimony regarding personal preference is admissible if it addresses issues of the witness's credibility and the persuasiveness of the expert's testimony." *Id.* Specifically, plaintiffs contend Dr. Lux should have been permitted to testify regarding his personal practice of informing patients of possible complications and risks both orally and in writing. Defendant, on the other hand, asserts evidence regarding personal preference or practice is inadmissible when the standard of care is not contested. See *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 29, 957 N.E.2d 413. Defendant maintains, because the experts agreed the standard of care was satisfied if Marc was verbally informed of the risk of the foot-drop complication, testimony regarding personal preference was inadmissible.

¶ 73          We agree with defendant. The *Taylor* court found the motion *in limine* that barred cross-examination of a defense expert's witness on personal practice was proper. *Id.* In *Taylor*, the expert testified to multiple treatment plans that fell within the standard of care and testified the defendants' treatment plan complied with that standard. *Id.* ¶ 18. On appeal, the plaintiff argued it should have been allowed to cross-examine the expert on his personal practice to use a different treatment plan. The court found no error in the trial court's decision to bar that cross-

- 22 -

examination, as the expert's testimony showed he, too, used a treatment plan that fell within the standard of care and his testimony was not inconsistent, meaning credibility was not at issue. *Id.* ¶¶ 28-29.

¶ 74            Plaintiffs' case law is distinguishable. In *Adams*, unlike here, the required standard of care was contested. See *Adams*, 369 Ill. App. 3d at 1003-04. The same was true in the case *Adams* relied upon in stating testimony regarding personal preference may be admissible. See *Gallina v. Watson*, 354 Ill. App. 3d 515, 521-22, 821 N.E.2d 326, 331 (2004) ("Dr. Whalen's excluded testimony goes to the credibility and persuasive value of his opinion Dr. Watson's actions were within the standard of care."). In this case, it was undisputed defendant met the standard of care if he orally communicated the risks of surgery to Marc. Dr. Lux agreed. It was irrelevant to Dr. Lux's credibility to say he does so verbally as well as in writing, because, just as in *Taylor*, the credibility of Dr. Lux is neither supported or undermined by such testimony as both means satisfy the standard of care. Moreover, the testimony does not make it more or less likely defendant met the standard of care. The trial court properly decided such testimony was irrelevant and prejudicial.

¶ 75            Plaintiffs further argue the trial court should have allowed the testimony as defendant opened the door to personal-practice questions when it questioned plaintiffs' expert, Dr. Smith. In their argument, however, plaintiffs fail to cite the testimony to which they were referring. Instead, plaintiffs loosely refer to the facts in the statement of facts, providing no citations to the statement of facts or the record. This practice violates Rule 341(h)(7)'s requirement that the argument section contain citations to the record. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("reference shall be made to the pages of the record on appeal where evidence

- 23 -

may be found").

¶ 76        Moreover, the testimony plaintiffs cite in the statement of facts regarding their

expert, Dr. Smith, does not touch on Dr. Smith's personal practice in informing his patients in a

manner greater than what the standard of care requires. Defendant cross-examined Dr. Smith on

how Dr. Smith communicated the risks to his patients before hip surgery to clarify the standard

of care did not require charting of the risks—an argument in response to plaintiffs' argument

regarding the absence of such information in Marc's chart:

> "[DEFENSE COUNSEL]: This form doesn't list any
>
> specific kind of risk of anesthesia, does it?
>
> A. It does not.
>
> Q. There are lots of different kinds of risks to anesthesia,
>
> true?
>
> A. Yes.
>
> Q. Did you see anywhere in Mr. Wilson's medical record
>
> that the anesthesia provider that did the anesthesia wrote out all of
>
> the specific risks that he discussed with Marc?
>
> A. No.
>
> Q. They don't usually do that, do they, sir?
>
> A. No.
>
> Q. And you said you reviewed Dr. Paluska's records,
>
> specifically the records showing that Marc had a couple of steroid
>
> injections into his hip before surgery?

A. Yes.

Q. There are risks to those injections, correct?

A. Yes.

Q. You didn't see in Dr. Paluska's note anywhere where he documented discussing the specific risks of those injections with Mr. Wilson, did you?

A. No.

Q. But I take it your expectation would be that the custom and practice or routine as an orthopedic surgeon would be to discuss those verbally before the injection, true?

A. Yes.

Q. That's what you do?

A. Yes."

Later, defendant cross-examined Dr. Smith on his personal practice of documenting informed-consent discussions. Dr. Smith testified he did not go into detail in his charts with specific risks and complications.

¶ 77        We fail to see how such questioning opened the door to allow plaintiffs' to elicit testimony regarding conduct greater than required for a standard of care, particularly when such evidence has no relevance to the ultimate issue of the case or to the credibility of the witness. We are not convinced the trial court's refusal to allow cross-examination of Dr. Lux on his personal practice in informing patients of known risks is an inconsistent or improper use of an order *in limine*.

¶ 78                    3. *"What's Not in the Chart"*

¶ 79          Plaintiffs contend there were three pieces of evidence on the issue of whether

defendant informed Marc of the risk of foot drop: (1) defendant's testimony he informed his

patients of these risks, (2) Marc's testimony he was not informed of the risk, and (3) the absence

of the discussion regarding the foot-drop risk in Marc's medical chart. Plaintiffs argue they

wanted to raise the last piece as evidence defendant did not discuss the risk of foot drop.

Plaintiffs maintain they initially "won the argument" as the trial court said it would allow

evidence showing the fact that Marc was informed of the risk was not in the chart. Plaintiffs

argue, however, the trial court changed course during opening statements when it did not allow

plaintiff's to tell the jury "there is no reference in the chart to [defendant] discussing the risks of

sciatic nerve injury with Marc" and ruled, "What's not in the chart cannot be stated, but what is

in the chart can be stated."

¶ 80          Plaintiffs further point to the trial court's decision to not allow plaintiffs to

question Dr. Lux about what Dr. Lux did not see, such as a written record of the risk of foot-drop

injury, in Marc's medical record. The trial court said it was not allowing inserting argument into

cross-examination: "What's not in the chart is argument."

¶ 81          Even if the trial court committed error, which we are not finding here, plaintiffs

cannot show they were prejudiced. "Error is reversible only if it is 'substantially prejudicial.' "

*McNeil*, 2011 IL App (4th) 110253, ¶ 22 (quoting *Wodziak v. Kash*, 278 Ill. App. 3d 901, 914,

663 N.E.2d 138, 147 (1996)). When the record demonstrates no injury was done, we will not

disturb the judgment or decree. *Id.* Here, the jury saw the chart information when plaintiffs

projected Exhibit 5 on a screen. Plaintiffs' counsel was permitted and repeatedly reminded he

- 26 -

could argue the absence of a record that the risk of foot-drop injury was relayed to Marc supported Marc's ultimate contention he was not told of the potential complication. After opening statements, the trial court addressed plaintiffs' counsel, stating: "I want to make sure there will and there can be testimony as to what's in the chart and, of course, in closing argument you'll be able to argue as to what was in the chart and reasonable inferences from that, which is what was not in the chart." The court stated, "what [defendant] did not put in the chart, you can ask him[.]" Plaintiffs then argued as much in closing argument:

> "And then I—in terms of anything else you remember [defendant] said, well, talked about the metal, talked about the ceramic potentially basically blowing up, and then the pros and cons versus the risks, the pros and cons versus the risk of catastrophic failure. The pros and cons he said would have been when I gave my routine. And I asked him well, wait, isn't that really you talk about metal versus ceramic? No, that's when I would have done my routine.
>
> You heard Dr. Lux this morning. Dr. Lux said no. I—I looked at that. What he's talking about is the metal versus the ceramic. So there's not even a reference in Exhibit 5 about any routine being given. You know, plaintiff was given a routine listing of the risk, or discussion of the risk. That's not even in Exhibit 5. So the first issue is, was the routine even given? Secondly, if it was given, and if that's all that was given, how does that tell a patient

about sciatic nerve injury, which the defendant says is one of the

complications you have to warn about?"

The jury was well-aware of what was not in the chart. No reversible error occurred.

¶ 82    Plaintiffs' last argument in this section is the trial court "erred by accusing [p]laintiffs' counsel of unprofessionalism in front of the jury." Plaintiffs point to the trial court's admonishment plaintiffs' counsel was posturing in front of the jury. Plaintiffs further emphasize the court's statement in its posttrial order counsel "started to roll his eyes" and "tilted his head back" and argue there was no record of those accusations.

¶ 83    Plaintiffs forfeit this argument. Contrary to court rules, there is no legal analysis supporting their claim. Points not argued are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). We further note the record reveals some evidence of posturing. When plaintiffs attempted to have Dr. Lux testify to what was not in Marc's record, the following occurred:

> "[PLAINTIFFS' COUNSEL]: So now we're back-circled
>
> around to where we're not going to discuss what's [inaudible].
>
> THE COURT: What you're talking about is argument.
>
> [Plaintiffs' counsel], back here.
>
> [PLAINTIFFS' COUNSEL]: I must [unintelligible], Judge.
>
> THE COURT: No, back here.
>
> [PLAINTIFFS' COUNSEL]: I'm fine.
>
> THE COURT: But I'm talking to you, and it's off the
>
> record as far as the jury's concerned. So back here.
>
> [PLAINTIFFS' COUNSEL]: I can hear you from here,

- 28 -

Judge.

> THE COURT: And so can the jury back there.
>
> [PLAINTIFFS' COUNSEL]: Is the white noise on yet?
>
> THE COURT: Mm-hmm.
>
> [PLAINTIFFS' COUNSEL]: Okay, go ahead."

¶ 84             4. *The "Complications" Order in Limine*

¶ 85        Plaintiffs last argue the trial court erred by not allowing evidence as to the complication rate for sciatic-nerve injury and foot drop. According to plaintiffs, the trial court restricted the case to the issue of whether defendant told Marc about the risk of sciatic-nerve injury, ignoring the issue of whether a reasonable person in Marc's position would have undergone the surgery if the risks were fully disclosed. Plaintiffs maintain the jury could not determine whether a reasonable person would have undergone the surgery without appreciating the seriousness of the injury and how often the complication occurs—up to a 3% chance to experience foot drop. Plaintiffs contend defendant opened the door to the evidence as, in opening statement, defendant told the jury defendant had performed 900 hip surgeries, leaving the impression foot drop "is an exceedingly rare complication of hip surgery."

¶ 86        Defendant responds prejudice was not proved. Defendant emphasizes the expert testimony establishes injury to the sciatic nerve is a known complication of hip surgery, such that patients must be informed of the risk. In particular, defendant points to plaintiffs' expert's testimony, Dr. Smith, that sciatic-nerve palsy was a "known complication" that was "uncommon" but it occurred enough to be a concern.

¶ 87        We agree with defendant. We fail to see how plaintiffs were substantially

- 29 -

prejudiced because the jury, who was informed sciatic injury was a known complication that occurred often enough to be a concern and to require doctors to inform patients of that risk, did not hear testimony up to 3% of patients who undergo hip replacement experience that injury.

¶ 88                                    III. CONCLUSION

¶ 89            We affirm the trial court's judgment.

¶ 90            Affirmed.